UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:	SUSAN L. HARMON,	:	Chapter 7
	:
	Debtor.	:	Bky. No. 10-15329 ELF
	:

# M E M O R A N D U M   O P I N I O N

## I. INTRODUCTION

The United States Trustee ("the UST") has filed a motion ("the Motion") seeking dismissal of the chapter 7 bankruptcy case of Debtor Susan Harmon ("the Debtor") on the ground that the grant of bankruptcy relief would be an "abuse" of the Bankruptcy Code within the meaning of 11 U.S.C. §707(b)(1).

The controversy centers on the UST's contention that in her "Chapter 7 Statement of Current Monthly Income And Means Test Calculation" (Official Form B22A), the Debtor improperly listed two expense deductions:

(1) $153.00/month in housing expenses for her leased residence; and

(2) $565.64/month expense for repayment of a nondischargeable student loan debt.

There is no dispute that if these expense deductions are disallowed, a presumption of abuse has arisen under §707(b)(2)(A). The UST further contends that the Debtor has not rebutted that presumption under §707(b)(2)(B) and therefore, the case should be dismissed.

The Debtor does not question the UST's arithmetic calculation, but argues that the expense deductions are proper and that no presumption of abuse has arisen. In the alternative,

-1-

she argues that even if the presumption has arisen, she has rebutted it because "special circumstances" exists justifying her deduction of the disputed expenses. See 11 U.S.C. §707(b)(2)(B).

As explained below, I conclude:

> (1) the Debtor may not take a deduction for her monthly student loan repayment obligation under §707(b)(2)(A)(ii);
>
> (2) a presumption of abuse has arisen under §707(b)(2)(A)(I);[1]
>
> (3) based on the record in this case, the Debtor has not established that "special circumstances" exist under §707(b)(2)(B) to permit her to treat her monthly student loan payment as an allowable expense; and,
>
> (4) the presumption of abuse has not been rebutted by the Debtor.

Therefore, I will grant the Motion.

## II.  PROCEDURAL HISTORY

The Debtor commenced this bankruptcy case on June 30, 2010. The §341 meeting of creditors was held and concluded on August 10, 2010. On August 19, 2010, the UST filed a Statement of Presumed Abuse. See 11 U.S.C. §704(b)(1)(A).[2] In the Statement, the UST stated:

---

[1] Because I have concluded that the disallowance of the monthly student loan payment as an expense under §707(b)(2)(A), by itself, gives rise to a presumption of abuse, it is unnecessary for me to consider the propriety of the housing expense deduction claimed by the Debtor.

[2] Section 704(b)(1) provides that in a chapter 7 case filed by an individual:

> (A) the United States trustee (or the bankruptcy administrator, if any) shall review all materials filed by the debtor and, not later than 10 days after the date of the first meeting of creditors, file with the court a statement as to whether the debtor's case would be presumed to be an abuse under section 707(b) . . . .

> Having considered [the materials filed by the Debtor] in reference to the criteria set forth in 11 U.S.C. Sec. 707(b)(2)(A), and, pursuant to 11 U.S.C. Sec. 704(b)(2), the United States Trustee has determined that:(1) the debtor's[ ] case should be presumed to be an abuse under section 707(b); and (2) the product of the debtor's current monthly income, multiplied by 12, is not less than the requirements specified in section 704(b)(2)(A) or (B).

(Doc. # 16).

On September 17, 2010, the UST timely filed the Motion.[3]  (Doc. # 19).  The Debtor filed a response to the Motion on October 7, 2010.  (Doc. #24).  The Debtor also filed a Declaration In Support of Rebutting the Presumption of Abuse Pursuant to 11 U.S.C. §707(b) on November 12, 2010.  (Doc. # 26).

I held and concluded a hearing in this contested matter on November 24, 2010. Thereafter, both sides submitted a memorandum of law in support of their respective positions, the last of which was filed on December 20, 2010.

### III.  FACTS

The Debtor is a single individual with no dependents.  She owns no real estate.  Exclusive of her interests in two retirement plans, the value of her personal property totals approximately $23,000.00, $20,000 of which is the value of her 2010 Subaru Forester.  The Debtor has minimal equity in the automobile as it serves as collateral for a loan with a balance of approximately $19,500.00.

On her Schedule F, the Debtor listed four credit card debts totaling $71,689.70.  In

---

[3]  The Motion was 29 days after the filing of the statement pertaining to the presumption of abuse.  See 11 U.S.C. §704(b)(2) (requiring that, within 30 days after filing the statement required by §704(b)(1), the UST file a motion to dismiss or a statement why a motion is not appropriate if the debtor's "current monthly income" is "above median" (i.e., above the amounts described in §707(b)(6)).

addition, on Schedule E, the Debtor listed as a priority debt a "school loan" of $38,000.00 owed to American Education Services.  But see 11 U.S.C. §507(a) (listing ten categories of priority debts, none of which refer to student loans).  She has no secured debts other than the automobile loan mentioned above.  The student loan has been in pay status since December 2008.  (Ex. D-1, ¶ 4).  The Debtor has approximately eight more years of payments before the loan will be repaid. (Id.).  Her monthly payment on the loan is $565.64.  She concedes that repayment of the student loan would not impose an "undue hardship" on her within the meaning of 11 U.S.C. §523(a)(8) and therefore, that the student loan is a nondischargeable debt in this bankruptcy case.  (Id. at ¶ 8).

The Debtor's income is derived both from employment and a U.S. Air Force pension. Her primary employment is as an information technology technician with the Commonwealth of Pennsylvania.  She also works part-time at a second job.  She works approximately 47 ½ hours per week.

On bankruptcy Schedule I, the Debtor listed her net monthly employment income after taxes as $2,936.98 and her monthly pension as $561.50, for a total monthly income of $3,498.48. On her Schedule J, she listed her total monthly expenses as $3,456.01, which includes a monthly rental payment of $981.00 for her residence and the $565.64 monthly student loan payment.

### IV.  DISCUSSION

#### A.

Section 707(b) of the Bankruptcy Code was amended dramatically by Congress in 2005 in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8,

-4-

119 Stat. 23 (2005). Currently §707(b) provides that:

> [a]fter notice and a hearing, the court, on . . . a motion by the United States trustee . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. §707(b)(1) (emphasis added). Section 707(b) then sets out a complicated process, commonly referred to as the "means test," for ascertaining whether, initially a "presumption of abuse" exists and then, ultimately, whether "abuse" exists. See 11 U.S.C. §707(b)(2).

The statutory means test methodology is memorialized in Official Form B22A promulgated by the Supreme Court and titled "Chapter 7 Statement of Current Monthly Income And Means Test Calculation" (hereafter, "Form B22A"). The rules of court mandate that each chapter 7 debtor complete and file Form B22A. See Fed. R. Bankr. P. 1007(b)(4).

In general terms,[4] the means test analysis involves the following steps:

1. calculating the debtor's "current monthly income" ("CMI"), defined in the statute, at 11 U.S.C. §101(10A), as the historical average of the debtor's actual income from all sources, except social security and certain victim payments, received during the six months prior to filing, see, e.g. In re Melvin, 411 B.R. 715, 719 (Bankr. D. Kan. 2008);

2. determining whether the debtor's CMI is "above median," see 11 U.S.C. §707(b)(6);[5]

---

[4] In this Memorandum, I will not analyze the numerous details of the chapter 7 consumer debtor "means testing" provisions. That subject has been adequately addressed elsewhere. See, e.g., David Gray Carlson, Means Testing: The Failed Bankruptcy Revolution of 2005, 15 Am. Bankr. Inst. L. Rev. 223 (Spring 2007); Eugene R. Wedoff, Means Testing in the New §707(b), 79 Am. Bankr. L.J. 231 (Spring 2005); see also In re Littman, 370 B.R. 820, 824-29 (Bankr. D. Idaho 2007) (providing a concise description of the chapter 7 means test process).

[5] The term "above median" refers to whether the debtor's CMI exceeds the median family income in the debtor's state for a family of the same size as the debtor's. If the income is not above
(continued...)

3. if the debtor's CMI is above median, determining the allowable amount of the debtor's expenses that may be applied against the CMI, some of which are based on the debtor's actual expenses and some of which are "deemed" expenses, see 11 U.S.C. §707(b)(2) (A)(ii), (iii) and (iv);[6]

4. determining whether a presumption of abuse arises, by computing whether the debtor's "Monthly disposable income" ("MDI"),[7] calculated by reducing CMI by the allowable expenses, exceeds certain objective standards that are set out in the statute; see 11 U.S.C. §707(b)(2)(A)(I).[8]

---

[5](...continued)
median, the debtor falls into what is referred to as a "safe harbor" and need not complete the balance of the means test calculation. See Official Form B22A, Lines 13-15.

[6]    On Form B22A, the allowable expenses are broken down into three main categories:

   (1) **Deductions under the Standards of the Internal Revenue Service**, which include certain categories of "standardized expense amounts for basic necessities, which the IRS prepares to help calculate taxpayers' ability to pay overdue taxes," as well as certain categories of actual expenses permitted by the IRS; see 11 U.S.C. §707(b)(2)(A)(ii)(I);

   (2) **Additional Living Expense Deductions**, which are actual expenses specifically authorized by the statute, see 11 U.S.C. §707(b)(2)(A)(ii)(II), (IV), (V); and,

   (3) **Deductions for Debt Payment** on secured debt and prepetition priority claims. See 11 U.S.C. §707(b)(2)(A)(iii). Also included in this category as an allowable expense is the projected amount of the administrative expenses were the case filed under chapter 13. See 11 U.S.C. §707(b)(2)(A)(ii)(III).

[7]    "Monthly disposable income" is the term employed on Line 50 of Form B22A.

[8]    A presumption of abuse arises if the debtor's MDI, multiplied by 60, exceeds either:

   (1) 25 percent of the debtor's nonpriority unsecured claims, or $7,025, whichever is greater; or,

   (2) $11,725.

11 U.S.C. §707(b)(2)(A)(i).

  5. if a presumption of abuse arises, determining whether the debtor has rebutted the presumption by demonstrating "special circumstances" that "justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative" and which reduce the difference between CMI and allowable expenses below the objective statutory "abuse" standard. See 11 U.S.C. §707(b)(2)(B).[9]

In addition, pursuant to 11 U.S.C. §707(b)(3), if a presumption of abuse does not arise or is rebutted, a court may dismiss a chapter 7 case (or convert it to chapter 11 or chapter 13 with the debtor's consent) for abuse based on either the debtor's bad faith in filing the bankruptcy petition or the totality of the circumstances.

  Based on this statutory framework, I turn to the dispute in this case.

### B.

  The first issue is whether the presumption of abuse has arisen after allowable expenses are deducted from the Debtor's CMI.

  On Form B22A, the Debtor listed her CMI as $4,881.64. The Debtor does not dispute that her CMI is "above median." See n.5, supra & accompanying text. However, she calculated her allowable expenses as totaling $4,862.20. In doing so, on Line 44 of Form B22A, she took her monthly student loan payment of $565.64 as an allowable expense for a payment of a prepetition priority claim. See U.S.C. §707(b)(2)(A)(iv). Based on her claimed expenses, the

---

[9] Section §707(b)(2)(B)(i) provides:

> In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

Debtor calculated her MDI as $19.44, an amount that does not give rise to a presumption of abuse.[10]

The UST asserts that the Debtor improperly claimed the deduction for her monthly student loan payment of $565.64 because the student loan debt is not a priority debt that may be deducted from CMI pursuant to §707(b)(2)(A)(iv). If the monthly student loan payment is disallowed as an expense, the Debtor's MDI increases to $585.08, which, multiplied by 60 equals $35,104.80. Under §707(b)(2)(A)(i)(II), this calculation creates a presumption of abuse because $35,104.80 exceeds both $1,166.40 and $22,422.43. See n.10, supra.

I conclude easily that the UST's objection to the Debtor's deduction of her monthly student loan payment is well taken. There is no mention of student loan debts in 11 U.S.C. §507(a) and therefore, there is no statutory basis for treating such debts as priority debts under the Bankruptcy Code. As a result of the disallowance of the monthly student loan payment as an expense that may be deducted from the Debtor's CMI, a presumption of abuse has arisen in this case.[11]

---

[10] The Debtor's MDI multiplied by 60 equals $1,166.40. This amount is less than $11,725.00. See 11 U.S.C. §707(b)(2)(A)(i)(II). It is also less than $17,922.43, which is 25 percent of the amount of the nonpriority unsecured debt listed by the Debtor on her Schedule F. See 11 U.S.C. §707(b)(2)(A)(i)(I). For these purposes, it is immaterial that the Debtor included her student loan debt on Schedule E, rather than Schedule F. Had she included the student loan in the total of her general unsecured debts, the spread between the Debtor's MDI (as she set it forth in Form B22A) multiplied by 60 ($1,166.40) and 25 percent of her unsecured debt ($22,422.43) would have been even greater. Because, as stated in the text infra, the monthly student loan payment is not a priority debt, 25 percent of the Debtor's unsecured debt is the higher amount, $22,422.43.

[11] As noted earlier, see n.1, supra, I do not need to address the UST's other contention: that the Debtor took an excess deduction of $153.00/month in housing expenses, representing the amount by which the Debtor's deduction for her actual monthly rent ($981.00) exceeds the maximum allowance for housing under the IRS Local Standards ($828.00).

C.

1.

The key issue in this case is whether the Debtor's obligation to repay a nondischargeable student loan constitutes "special circumstances" under §707(b)(2)(B). The presumption of abuse having arisen and therefore, a prima facie case of abuse under § 707(b)(2)(A) having been established, the Debtor bears the burden of proof, under §727(b)(2)(B), of showing that "special circumstances" justify the expenses that the debtor has claimed. In re Womer, 427 B.R. 334, 336 (Bankr. M.D. Pa. 2010); In re Williams, 424 B.R. 207, 211 (Bankr. W.D. Va. 2010), aff'd 2010 WL 3292812 (W.D. Va. Aug 19, 2010); In re Witek, 383 B.R. 323, 329 (Bankr. N.D. Ohio 2007); see also In re Meade, 420 B.R. 291, 303-04 (Bankr. W.D. Va. 2009).

A debtor seeking to establish "special circumstances" under §707(b)(2)(B) must satisfy both procedural and substantive requirements. The procedural requirements

> are set forth in § 707(b)(2)(B)(ii), (iii), and (iv), and they require a debtor (1) to "itemize" each additional expense or income adjustment by setting forth the nature of the suggested adjustment, its amount, and its impact on the debtor's finances and the means test calculation; (2) to provide "documentation" of the additional expense or income adjustment; (3) to provide a "detailed explanation" of the "special circumstances" that make the additional expense or income adjustment "necessary and reasonable;" and (4) to "attest under oath" to the accuracy of the information the debtor provides.

In re Pageau, 383 B.R. 221, 225 (Bankr. D.N.H. 2008) (citing Littman, 370 B.R. at 830); Haman, 366 B.R. 307, 312 (Bankr. D. Del. 2007). The UST concedes that the Debtor has satisfied the procedural requirements for establishing "special circumstances." (UST Memorandum of Law at 11).

Substantively, §707(b)(2)(B) requires that the "special circumstances" be sufficient to "justify additional expenses or adjustments of current monthly income for which there is no

reasonable alternative." 11 U.S.C. §707(b)(2)(B)(i). The statute identifies two examples of "special circumstances:" a serious medical condition or a call or order to active duty in the Armed Forces. Id.

Courts generally agree that the statute's examples of "special circumstances" are non-exclusive and merely illustrative. Pageau, 383 B.R. at 226; In re Lenton, 358 B.R. 651, 661 n.22 (Bankr. E.D. Pa. 2006), appeal dismissed, 2009 WL 1872667 (E.D. Pa. Jun. 29, 2009). However, courts are divided in their views regarding the scope of the "special circumstances" provision. One court has summarized the differing judicial viewpoints as follows:

> One group of courts [have] determined that "special circumstances" should be narrowly interpreted and based upon the plain meaning of "special." [One court] notes that these cases find that in order for a debtor's circumstances to be "special," similar to those in the examples provided by Congress, they must be "necessary and reasonable" expenses where there is no reasonable alternative other than the payment of expense. In re Siler, 426 B.R. [167,] 172 [(Bankr. W.D.N.C. 2010]; see also In re Martin, 371 B.R. 347, 352 (Bankr. [C.]D.Ill. 2007) (stating that "special circumstances" should be construed as "uncommon, unusual, exceptional, distinct, peculiar, particular, additional or extra factors or conditions ..."). This interpretation of "special circumstance" would prevent most debtors from meeting its high standard. In re Siler 426 B.R. at 172; see also In re Haar, 360 B.R. 759, 760 (Bankr. N.D. Ohio 2007) (providing that Congress intended "to set this bar extremely high, placing it effectively off limits for most debtors").
>
> The second approach to the interpretation of "special circumstance" does not necessarily mean that the situation be extraordinary, outside of the control of a debtor, or always unanticipated. . . . In re Fonash, 401 B.R. 143, 146 (noting "burden to establish special circumstances was not set particularly high, making the presumption truly rebuttable. The standard ... is special, not extraordinary."); . . . In re Crego, 387 B.R. 225, 228 (Bankr. E.D. Wis. 2008) (pointing out that "special circumstances" is not worded as harshly as other exceptions or limitations under the Bankruptcy Code, including section 523(a)(8) related to undue hardship).

In re Hammock, 436 B.R. 343, 354 -55 (Bankr. E.D.N.C. 2010) (most citations omitted).[12]

**2.**

The Debtor's position, that her nondischargeable obligation to repay her student loan constitutes "special circumstances," is supported by a line of bankruptcy court decisions. However, there is another line of cases that rejects the proposition that repayment of nondischargeable student loans may be treated as an allowable expense in calculating MDI. See Womer 427 B.R. at 336 (collecting both lines of cases).

In reported decisions involving student loans, courts have employed at least three different standards in analyzing whether "special circumstances" exist.

---

[12] Underlying this division among the courts regarding the scope of "special circumstances" is an intellectual debate concerning the proper role of the bankruptcy court in applying the law.

Courts construing "special circumstances" broadly may be treating §707(b)(2)(B) as a legislative license to ameliorate the strict application of the means test when doing so would achieve the Code's fundamental mission of granting relief to honest and worthy debtors. For those courts, "special circumstances" is, in a sense, the statutory converse to the "good faith" doctrine in bankruptcy, pursuant to which courts avoid the perverse result of granting relief to a debtor who has acted in inequitably even though the debtor may satisfy all of the express statutory requirements of the Code. Courts construing "special circumstances" broadly do so based on the conviction that the bankruptcy court's role is to act as a court of equity, broadly exercising the discretion afforded it by the statute to achieve results in individual cases that are consistent with the statute's fundamental purposes.

Courts construing "special circumstances" narrowly do so based on: (a) an inference regarding legislative intent that they draw from the nature of the examples of "special circumstances" provided in the statute; (b) their perception that the 2005 amendments to the Bankruptcy Code were intended to curb some of the discretion previously afforded bankruptcy courts; and (c) a fundamental belief that "a bankruptcy judge should not invoke equitable principles when construing the Bankruptcy Code or Rules" because the court's "powers stem virtually exclusively from statutes." Alan M. Ahart, The Limited Scope of Implied Powers of a Bankruptcy Judge: a Statutory Court of Bankruptcy, Not a Court of Equity, 79 Am. Bankr. L.J. 1, 2 (2005).

The case before me does not require that I choose sides in this vigorous judicial debate.

Some courts focus on the student loan's status as a nondischargeable debt and evaluate whether the debtor's ongoing, post-bankruptcy liability on the debt is per se "special circumstances" because the debtor has no alternative but to pay the debt. See Siler, 426 B.R. at 174-75 (collecting cases on both sides of the issue).

Other courts consider the reasons why the debtor incurred the student loan debt, sometimes opining that repayment of a student loan constitutes "special circumstances" only if the loan was "incurred in pursuit of education and training that is necessitated by permanent injury, disability or an employer closing," as opposed to "[p]ayments on student loans, business loans or equipment loans, incurred solely to secure a more advantageous income or to enter a different vocation, [which] are not special circumstances." Pageau, 383 B.R. at 228 (Bankr. D.N.H. 2008); accord Siler, 426 B.R. at 175; see generally In re Egebjerg, 574 F.3d 1045, 1053 (9th Cir. 2009) (repayment of 401k loan taken out to repay debts was not "special circumstances" or life altering circumstance of kind referenced in statute).

Finally, some courts, without considering the origins of the student loan debt, focus on the future and assess the likely consequences for the debtor if the student loan payment is not treated as a "special circumstance." See, e.g., In re Knight, 370 B.R. 429, 437-38 (Bankr. N.D. Ga. 2007) ("A special circumstance is one that, if the debtor is not permitted to adjust her income or expenses accordingly, results in a demonstrable economic unfairness prejudicial to the debtor"); see also In re Beckett, 2010 WL 3894429, at *6 (Bankr. N.D. Ohio Sept. 30, 2010) (in dictum, stating that court would deny motion to dismiss under §707(b)(3) if "(1) there existed a large student-loan obligation which, given its nondischargeable character, would continue to increase in principal during the duration of a Chapter 13 plan; and (2) as compared to the

student-loan obligations, the distribution to the debtor's other unsecured creditors would be minimal under a Chapter 13 plan"); Womer, 427 B.R. at 336 (determining student loan repayment was not a "special circumstance" because the debtor did not provide a "significant explanation as to how a nondischargeable student loan would have grave consequences going forward") (emphasis added).

### 3.

I conclude that the first theory of "special circumstances" is overbroad and I reject it as a matter of law. Nondischargeability is a basic bankruptcy concept that encompasses a number of different types of debts. See 11 U.S.C. §523(a). The concept of a "nondischargeable debt" is entirely distinct from the concept of a "priority debt." It is true that certain nondischargeable debts are also priority debts and therefore, are allowable expenses under the means test. See 11 U.S.C. §727(b)(2)(A)(iv). For example, payments of domestic support obligations and priority taxes are allowable expenses. See 11 U.S.C. §507(a)(1), (8) and § 523(a)(1), (5). However, not all nondischargeable debts are priority debts. Had Congress intended to render payments on all categories of nondischargeable debts as allowable expenses under §707(b)(2)(A), it would have been simple enough to do so expressly. In the absence of some textual support in the Bankruptcy Code, I fail to see how a student loan repayment constitutes "special circumstances" based solely on its status as a nondischargeable debt. Accord Beckett, 2010 WL 3894429, at *5; In re Lightsey, 374 B.R. 377, 382 (Bankr. S.D. Ga. 2007). But see In re Delbecq, 368 B.R. 754, 759-60 (Bankr. S.D. Ind. 2007).

The two other standards that have been articulated by the courts provide a far more

plausible basis for deciding whether a debtor's student loan repayments constitute "special circumstances." However, I need not decide whether either or both of these rationales should serve as a test for "special circumstances" or, more generally, the statutory term's precise contours. Assuming arguendo that the second and/or the third standards state grounds for a finding of "special circumstances" under 11 U.S.C. §707(b)(2)(B), the Debtor has not met her burden of proof under either one.

There is no evidence suggesting that the Debtor incurred the educational expenses due to some sort of life adversity such as a job loss or disability, as opposed to a motivation to "secure a more advantageous income or to enter a different vocation." Pageau, 383 B.R. at 228. Therefore, the Debtor cannot rebut the presumption under the second standard.

Nor has the Debtor demonstrated under the third rationale that "grave consequences," Womer, 427 B.R. at 336, would more likely than not result if the student loans were not treated as allowable expenses under §707(b). Rather, the Debtor simply assumes that she has no alternative but to pay the student loan because it is nondischargeable.

I have independently considered the consequences of disallowing the monthly student loan payment as an allowable expense and I perceive two potential consequences if the student loan expense is disallowed. Obviously, the Debtor may choose to allow the case to be dismissed, in which case she will remain burdened by substantial credit card debt. However, there is an alternative that need not result in grave consequences: conversion to chapter 13, which would accord the Debtor significant relief with respect to the approximately $71,000.00 in unpaid credit card debt she has incurred, without resulting in any unreasonable burden on the Debtor relating to

her student loan.[13]

If this case were to proceed under chapter 13, given her monthly income and expense disclosures, the Debtor would likely propose a plan in which she would make plan payments to the chapter 13 trustee in an amount that approximates her student loan payment. If one assumes that all scheduled unsecured creditors file claims, the Debtor's student loan will receive approximately 35% of the distribution under the plan.[14] In practical terms, at the end of 60 months, because American Educational Services would receive approximately 35% of the amount contractually due, the Debtor will have advanced approximately 21 months instead of 60 months toward completing the repayment of her student loan (60 months x 35% = 21 months).[15] Ultimately, the effect of the disallowance of the monthly student loan payment as a "special circumstance" is that it will take the Debtor a little more than 11 years from the present, rather than 8 years from the present, to pay off her student loan. There may be situations in which such

---

[13] Some courts have held that courts should not evaluate chapter 13 scenarios in evaluating whether a particular expense constitutes "special circumstances." E.g. Haman, 366 B.R. at 315; Pageau, 383 B.R. at 229-230. Respectfully, I disagree – at least if a finding of "special circumstances" is to be grounded in the impact on the debtor of disallowing the claimed expense.

[14] The student loan debt is $38,000.00. The other debts total approximately $71,000. See Part III, supra.

[15] I acknowledge that this is a "rough" analysis. I have not accounted for all of the potential chapter 13 administrative expenses (such as trustee fees and additional counsel fees). Also, there may be some increase in the balance due on the student loan in the form of unpaid interest and late charges. See generally Leeper v. Pennsylvania Higher Educ. Assistance Agency, 49 F.3d 98 (3d Cir. 1995). On the other hand, I have assumed that all unsecured creditors will file claims, which might not occur and if less than all of the creditors filed claims the distribution to American Educational Services would increase. It may also be possible for the Debtor to include plan provisions to mitigate some of the negative consequences of providing for a long term student loan in a chapter 13 plan, see In re Boscaccy, 2010 WL 4193074, at *10 (Bankr. N.D. Miss. Oct. 20, 2010), although I do not pass on the confirmability of such plan provisions at this time.

a consequence would rise to the level of "special circumstances," but, if so, the Debtor has not established why that is so in her case.

Based on the foregoing, I conclude that the Debtor has not met her burden of proving that "special circumstances" exist warranting the allowance of her monthly student loan payment as an expense deduction under 11 U.S.C. §707(b)(2)(B) and that she has not rebutted the presumption of abuse that has arisen in this case.

### 4.

The Debtor appears to make one final argument. She implicitly contends that the chapter 13 scenario outlined in Part IV.C.3. above is inaccurate because, if she converted this case to chapter 13, she could propose a plan that provided for her to continue to pay her full monthly payment to American Education Services on account of her student loan. The Debtor suggests that "the unsecured creditors would receive nothing" under such a plan. (Debtor's Memorandum of Law at 4) (unpaginated). In effect, the Debtor suggests that the court look at the "big picture" in evaluating either "special circumstances" or abuse generally under §707(b) and, based on the premise that the unsecured creditors would not obtain materially better treatment under chapter 13, determine that this chapter 7 case is not an abuse of the Bankruptcy Code.

As is the case with virtually every other means test issue litigated since 2005, courts are divided on the general legal principle implicitly put forward by the Debtor – that a chapter 7 will not be an abuse if the likely chapter 13 alternative would yield little or no distribution to

unsecured creditors.[16]  But even if I were to accept, as a general proposition, that a chapter 7 case cannot be an abuse if the chapter 13 means test does not compel a meaningful distribution to unsecured creditors,[17] I am not convinced that the Debtor's premise is correct.  That is, the Debtor has not made an adequate showing that conversion to chapter 13 would yield no meaningful benefit to her unsecured creditors.

The unstated premise in the Debtor's argument is that in a chapter 13 case, she will be permitted to keep paying her monthly student loan payment directly to American Education Services, leaving very little, if anything, available as a plan payment for the benefit of her other unsecured creditors.  In other words, she assumes that she is entitled to discriminate against her other unsecured creditors by treating American Education Services more favorably in the plan.  However, it is not clear, by any means, that such discrimination would be permissible under 11 U.S.C. §1322(b)(1).  See In re Orawsky, 387 B.R. 128 (Bankr. E.D. Pa. 2008) (following In re Bentley, 266 B.R. 229 (B.A.P 1st Cir. 2001) and holding that proposed chapter 13 plans that disfavor one class of creditors by deviating from certain core principles under chapter 13 and that

---

[16]     Compare Delbecq, 368 B.R. at 760 ("there is simply no logic to essentially forcing a debtor into a Chapter 13 case if the distribution in that case will yield nothing to unsecured creditors"); In re Skvorecz, 369 B.R. 638, 644 (Bankr. D. Colo. 2007) ("If part of the intent of Congress in tying Chapter 7 relief to a means test, was to require a debtor to repay his creditors if he is able to, then it would be nonsensical that the very payments or expenses which tip the calculation so as to create the presumption of abuse, an indication of an ability to repay, are the same payments or expenses that are excepted from "disposable income" in a Chapter 13") with Lightsey, 374 B.R. at 382; In re Johns, 342 B.R. 626, 629 (Bankr. E.D.Okla. 2006); In re Castle, 362 B.R. 846, 850-51 (Bankr. N.D. Ohio 2006).  Once again, I need not issue any broad pronouncement in order to decide the matter before me.

[17]     A presumption of abuse can arise under chapter 7 even though the chapter 13 means test does not require a meaningful distribution to unsecured creditors due to certain differences between the means test under the different chapters.  See, e.g., 11 U.S.C. §541(b)(7)(I) (providing that amounts withheld from an employees wages for contributions to certain retirement accounts "shall not constitute disposable income as defined in section 1325(b)(2)").

are not offset by some benefit to disfavored class are more likely (though not necessarily) to be "unfair" under § 1322(b)(1) and not confirmable); see also In re Steele, 2010 WL 4791837, at *5 (Bankr. D. Wyo. Nov.18, 2010) (denying confirmation to plan that discriminated in favor of student loan debt, finding that debtors would be in much better position to pay student loan obligation upon exiting bankruptcy, without impacting other non-priority unsecured claim distribution). Contra Delbecq, 358 B.R. at 759-60.

     The Debtor has not established that the type of discrimination that she contemplates would be tolerated were her case converted to chapter 13. In Orawsky, the discrimination in favor of the student loan creditor was permitted because the debtor established that, even with the discrimination, the disfavored class of unsecured creditors would receive better treatment under the plan than that mandated by the application of the chapter 13 means test. The Orwasky debtor had no minimum payment obligation to her general unsecured creditors based on the chapter 13 means test. Yet, she proposed to provide more than she was legally obligated to pay those creditors, provided that she also be permitted to treat her student loan more favorably by maintaining her regular monthly payment on that debt. Here, the Debtor does not make a similar showing. The application of the chapter 13 means test (excluding the student loan deductible expenses) undoubtedly would mandate a significant distribution to the Debtor's unsecured creditors, in the approximate amount of $30,000.00. See n.15 & accompanying text. The Debtor articulates no reason why all of her unsecured creditors (including the student loan creditor) should not share pro rata in that distribution.[18]

---

[18]     In Orawsky, I mentioned, without deciding, that there may be another justification for plan discrimination in chapter 13 cases, i.e., "circumstances in which a debtor's interest in an effective

(continued...)

In short, the Debtor has not come forward with a convincing argument that a conversion to chapter 13 would provide no meaningful benefit to unsecured creditors. Therefore, the Debtor's last argument in response to the Motion fails.

## V. CONCLUSION

For the reasons set forth above, the UST's Motion will be granted.[19] I will enter an order giving the Debtor two (2) weeks to determine whether she wishes to convert this case to chapter 13 or chapter 11. If she fails to do so, the case will be dismissed.

---

[18](...continued)
financial rehabilitation and fresh start may justify discriminatory treatment under §1322(b)(1)." Orawsky, 387 B.R. at 156 n.50; see also Bosccaccy, 2010 WL 4193074, at *9 (permitting plan to discriminate in favor of student loan claim because "[i]f the debtors are not permitted to maintain the payments on their sizeable student loan debts, the interest accrual on these debts during the life of their Chapter 13 plan will likely render their bankruptcy filing meaningless"). If such a justification for discrimination exists under chapter 13, it seems analogous to the "grave consequences" basis for "special circumstances" under §707(b)(2)(B) discussed in Part IV.C.3, supra. This simply brings us back to question whether equal treatment of the student loan debt will have a materially negative effect on the Debtor's financial rehabilitation and, as stated earlier, there is insufficient evidence to support such a finding.

[19] There is some authority for the proposition that if a presumption of abuse arises under §707(b)(2) and it is unrebutted, the court retains some discretion not to dismiss the case. See 11 U.S.C. §707(b)(1) (the court "may" dismiss a case if the granting of relief would be an abuse); In re Burks, 2009 WL 103618, at *6 (Bankr. N.D. Tex. Jan. 13, 2009); In re Mravik, 399 B.R. 202, 206-10 (Bankr. E.D. Wis. 2008); Skvorecz, 369 B.R. at 642-43. Contra Justice v. Advanced Control Solutions, Inc., 2008 WL 4368668, at *5 (W.D. Ark. 2008); Siler, 426 B.R. at 173; Haman, 366 B.R. at 311. Those courts holding that such discretion exists recognize that such discretion in this area is "limited and 'should not be exercised lightly.'" Siler, 426 B.R. at 173 (quoting Mravik, 399 B.R. at 210).

The Debtor has not requested that I exercise any discretion that may I have, so I have no reason to determine whether such discretion exists, the scope of any such discretion or how it might be exercised in the circumstances presented here.

**Date: February 16, 2011**

**ERIC L. FRANK
U.S. BANKRUPTCY JUDGE**